UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

ROBIN SOUTHWELL,                          )
                                          )
            Plaintiff,                    )
                                          )
v.                                        )        No.:   3:10-CV-550-TAV-CCS
                                          )
SUMMIT VIEW OF FARRAGUT, LLC,             )
                                          )
            Defendant.                    )

## MEMORANDUM OPINION

This civil action is before the Court on defendant's Motion for Summary
Judgment [Doc. 30] as to all of plaintiff's claims. Plaintiff has responded in opposition
[Docs. 35, 36], and defendant has replied [Doc. 37]. The Court has carefully reviewed
the pending motion [Doc. 30], the supporting, opposing, and reply briefs [Docs. 31, 35,
36, 37], the relevant documents and exhibits, and the controlling law. For the reasons set
forth herein, defendant's motion [Doc. 30] will be **GRANTED**, plaintiff's claims will be
**DISMISSED**, and this case will be closed.

## I.      Background

On December 11, 2009, plaintiff's mother, Claudia Adkins ("Adkins"), was
transported via Rural Metro ambulance from The University of Tennessee Medical
Center ("UT Medical Center") to defendant, Summit View of Farragut, LLC ("Summit
View"), in Knox County, Tennessee, for purposes of rehabilitation [Doc. 25 ¶ 8].
Because Adkins was blind and deaf, she required an interpreter in order to communicate

with others [*Id.* ¶ 7]. It is unknown exactly when Adkins left UT Medical Center or arrived at Summit View, and to this end, plaintiff states that she received a call from the "head nurse" (presumably Christine Delaney [Doc. 36-1 ¶ 2]) at UT Medical Center around 4:00 p.m. informing her that Adkins was "on her way to Summit View" [Doc. 37-1 p. 3]. Therefore, plaintiff "figured" that Adkins arrived at Summit View around 4:15 p.m. because it is approximately 15 miles from UT Medical Center to Summit View [*Id.*]. The Admissions Director for Summit View, Doris Henning ("Henning"), who was present when Adkins arrived at Summit View, states that "Adkins arrived at the facility after the close of normal business hours" [Doc. 30-1 ¶ 4]. For purposes of this motion, the Court will assume Adkins arrived late in the afternoon on December 11, which was a Friday.

According to Henning, Summit View had not received any paperwork pertaining to Adkins and her condition prior to her arrival, and thus it was not until Adkins arrived at Summit View that the facility learned through an interpreter accompanying Adkins that she was blind and deaf [Doc. 30-1 ¶ 3]. According to Henning, because Adkins arrived after the close of normal business hours, Summit View had no way to arrange to employ an interpreter for Adkins for the weekend because such agencies were closed by that time [*Id.* ¶ 4]. Summit View did not have an interpreter on staff at the facility when Adkins arrived because no Summit View residents were both blind and deaf [*Id.*].

Consequently, Summit View did not accept Adkins for admission to the facility because it would have been unable to communicate with her, given her condition and its inability to obtain an interpreter [*Id.* ¶ 5]. To this end, Summit View's Medical Director at that time, Dr. Bonita Gonzalez ("Dr. Gonzalez"), was present when Adkins arrived and

2

determined that she needed to be returned to UT Medical Center because "her needs could not be met at Summit View due to her conditions" [*Id.*]. Thus, Dr. Gonzalez personally called UT Medical Center to inform its personnel of the situation and that Adkins was being sent back there [*Id.*].

Henning emphasizes that Summit View never entered into an admission agreement with Adkins and "did not undertake her care or treatment" [*Id.* ¶ 6]. Regarding Summit View's interaction with Adkins, Henning recalls that:

> No plan of care was ever formulated or implemented for Ms. Adkins, and Ms. Adkins at no time received medical care or treatment or custodial care from any staff member at Summit View, and no staff member at Summit View accepted responsibility for providing care or treatment to Ms. Adkins[.] Indeed, Ms. Adkins was never removed from the stretcher on which she had been transported to Summit View by ambulance. She never even went beyond the entrance hallway or entered the area of the building where patient care is provided, and she was actually present at Summit View for only approximately 10 minutes before being transported back to [UT Medical Center] via the same ambulance in which she had arrived. During that entire time, the interpreter who had accompanied Ms. Adkins from [UT Medical Center] to Summit View was there with Ms. Adkins, and was able to communicate with Ms. Adkins regarding the situation and the events that were taking place.

[*Id.*]. Moreover, Summit View asserts that the Rural Metro emergency medical technicians that accompanied Adkins to and from UT Medical Center were with Adkins the entire time she was at Summit View and that Adkins remained on their gurney during this time [Docs. 31, 30-1 ¶ 6]. According to Henning, "it was the opinion of everyone involved that it was in the best interest of Ms. Adkins to return her to [UT Medical Center]" [Doc. 30-1 ¶ 6].

3

Plaintiff alleges that Christine Delaney, the case manager at UT Medical Center, informed her early in the afternoon on December 11 that Summit View had agreed to the transfer of Adkins prior to Adkins's transfer by ambulance from UT Medical Center [Doc. 36-1 ¶¶ 2, 4]. An affidavit from Terry Osborne, the CEO of the Knoxville Center of the Deaf, confirms that "[t]he transferring of deaf and blind patients such as Ms. Adkins from one medical facility to another medical facility does not occur unless the transfer is authorized by the receiving medical facility" [Doc. 36-2 ¶ 4]. In addition, plaintiff disputes Summit View's assertion that an interpreter traveled with Adkins from UT Medical Center to Summit View, citing the statement of an employee of Knoxville Center of the Deaf that she voluntarily sent an interpreter to Summit View to check on Adkins and that "there was no interpreter in the ambulance with Ms. Adkins when she arrived at Summit View" [Doc. 36-3 ¶ 3].

As mentioned, plaintiff "figured" that Adkins arrived at Summit View around 4:15 p.m., and plaintiff "assumed" Adkins was there for around two hours because she did not receive a call from UT Medical Center personnel updating her that Adkins had arrived back at UT Medical Center until 6:30 p.m. [Doc. 37-1 p. 3]. Specifically, plaintiff contradicts Henning's recollection by stating that Adkins was not transferred back to UT Medical Center until "approximately 6:15 p.m." [Doc. 36-3 ¶ 10], alleging that in the interim "Summit View . . . refused to care for [Adkins], refused to place her in a room, refused to provide her with an interpreter, refused to provide her with food and hydration, and refused to communicate with her" [*Id.* ¶ 9]. Moreover, plaintiff's amended complaint

4

alleges that Summit View's nonmedical employees "failed to inform the supervising Nursing Home Physician of the progression and deterioration of Claudia Adkin's [sic] condition throughout the time she was at the Defendant's nursing home" and that Adkins was thus forced to endure "physical pain and suffering, severe mental and emotional pain and suffering, [was] robbed her of her dignity of life and forced her to suffer humiliation, [suffered] continued mental anguish[,] and [ultimately] death" [Doc. 25 ¶¶ 13, 14]. Plaintiff also argues that Summit View "discriminated against [Adkins] by refusing to care for her because she was deaf and blind" [Doc. 35].

Regarding the dispute as to the amount of time Adkins was at Summit View, plaintiff bases her assertion that Adkins did not return to UT Medical Center until 6:30 p.m. on the fact that she received a call at 6:30 p.m. from a UT Medical Center employee informing her that Adkins had returned to the hospital and that the hospital was waiting for a bed for Adkins [Doc. 37-1 p. 3]. Presumably, plaintiff assumes that Adkins was present at Summit View for two hours based on her assumptions that the 15-mile trip from UT Medical Center to Summit View takes 15 minutes to complete and that plaintiff left UT Medical Center at 4:00 p.m. and returned at 6:30 p.m. Plaintiff claims that because UT Medical Center did not anticipate Adkins's return, Adkins was not placed in a room until almost midnight on the night of December 11 [Doc. 36-1 ¶ 12].

According to an affidavit from Trent McNeeley, a licensed medical doctor, submitted by Summit View, medical records show that on December 11, 2009, Adkins was suffering from chronic obstructive pulmonary disease ("COPD") and nasopharyngeal

carcinoma, which is a type of cancer [Doc. 30-2 ¶ 2]. Adkins died on October 6, 2010, in Riverview, Florida, of nasopharyngeal carcinoma [Doc. 37-2]. According to McNeeley, "to a reasonable degree of medical certainty, . . . the death of Ms. Adkins 10 months after the events of December 11, 2009 at Summit View was not proximately caused by any act or omission on the part of Summit View or any agent or employee of Summit View" [*Id.* ¶ 3].

On November 23, 2010, plaintiff filed a complaint [Doc. 1 ¶ 1] in state court containing allegations of medical malpractice and a violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.* (the "ADA")[1] [Doc. 1-1 ¶ 4]. Summit View removed the case to this Court based on diversity jurisdiction [Doc. 1 ¶ 5] and filed a motion for summary judgment [Doc. 5]. This Court treated that motion as a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and granted the motion. This Court found that plaintiff had failed to establish the essential elements of her medical malpractice claims by failing to comply with the requirements of the Tennessee Medical Malpractice Act ("TMMA"), T.C.A. §§ 29-26-115, *et seq.*, and had failed to state a claim for which relief may be granted under the ADA because the applicable provision of that legislation provided only for injunctive relief, which was moot given that Adkins was by then deceased [Doc. 19]. Plaintiff appealed to the Sixth Circuit, which affirmed this Court's dismissal on the aforementioned grounds, but remanded the case to allow plaintiff to amend her complaint to state an ordinary negligence claim.

---

[1] The ADA claim stemmed from Summit View's alleged failure to provide Adkins an interpreter.

6

*Southwell v. Summit View of Farragut, LLC*, 494 F. App'x 508, 513 (6th Cir. 2012).

Regarding the ADA claim, the Sixth Circuit stated that "[w]e have previously held that a

plaintiff may not bootstrap an ADA claim against a private entity into a claim for

monetary damages via a negligence per se theory." *Id.* at 512 n.3.

As for its decision to remand, the Sixth Circuit stated that:

> [plaintiff] asserts three specific factual allegations against Summit
> View that could plausibly be construed as sounding in the failure to
> implement a plan of care, and thus constitute a claim for ordinary
> negligence under Tennessee law: (1) failing to "tak[e] proper care of
> the late Claudia Adkins, including placing her in a suitable room,"
> (2) failing to properly care for Adkins's emphysema and cancer; and
> (3) failing to "promptly inform[] the supervising Nursing Home
> Physician of the progression and deterioration of the patient's
> condition . . . ." However, there is nothing in [plaintiff's] complaint
> that asserts that these alleged failures stem from nonmedical
> personnel's implementation of Adkins's plan of care, which would
> be required to make out an ordinary negligence complaint under
> *French*. Thus, even with a liberal reading of the complaint,
> [plaintiff's] ordinary negligence claim should be dismissed as well.

*Id.* at 513 (quoting [Doc. 1-1]). The Sixth Circuit noted that "'where a more carefully

drafted complaint might state a claim, a plaintiff must be given at least one chance to

amend the complaint before the district court dismisses the action with prejudice.'" *Id.*

(quoting *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 644 (6th Cir.

2003)). In addition, the Sixth Circuit held that plaintiff could plead a wrongful death

claim in her amended complaint as well, given that under Tennessee law, the wrongful

death claim would be derivative of the ordinary negligence claim. *Id.*

As a result, plaintiff filed an amended complaint [Doc. 25], alleging negligence

per se on behalf of Summit View stemming from violations of the ADA, the Tennessee

7

Nursing Home Residents' Rights Act (the "TNHRRA"), the Tennessee Adult Protection Act (the "TAPA") and, as plaintiff states, "42 CFR 483.10 *et seq.*; and by failing to comply with all of the standards of care required by the Nursing Home Regulations of the Tennessee Department of Health; and Rules of the Tennessee Department of Health Board for Licensing Health Care Facilities, Chapter 1200-8-6, et seq. 28" [Doc. 25 ¶ 27]. Because the Sixth Circuit has already expressly rejected such an ADA claim and affirmed this Court's dismissal of such with prejudice, the Court will not address any allegations of negligence per se based on Summit View's alleged violation of the ADA in terms of failing to provide Adkins with an interpreter. *Southwell*, 494 F. App'x at 513. Plaintiff also alleges ordinary negligence by Summit View [Doc. 36]. Summarily, plaintiff claims that Summit View "failed to meet the standard of care and violated its duty of care to Ms. Claudia Adkins by failing to provide services that were nonmedical in nature." [Doc. 25 ¶ 34].

Plaintiff also brings a wrongful death claim that derives from the negligence claims, alleging that:

> [a]s a direct and proximate result of the Defendants['] above described negligence in causing the death of Ms. Claudia Adkin[s], the Plaintiff has sustained among other things, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of comfort, loss of protection, loss of attention, loss of advice, loss of counsel, and loss of guidance.

[*Id.* ¶ 49]. Furthermore, the amended complaint alleges that prior to her death, Adkins "suffered a loss of enjoyment of life in the period from injury to death and suffered mentally and physically between her injury and death" [*Id.* ¶ 36]. Yet, plaintiff does not

elaborate as to these claims. Finally, plaintiff alleges negligent infliction of emotional distress and that Summit View violated the TAPA [*Id.* ¶¶ 39, 43]. As compensation for Summit View's alleged wrongs, plaintiff demands $15,000,000.00 in compensatory damages and $25,000,000.00 in punitive damages [*Id.* ¶ 51].

As far as the alleged injuries are concerned, plaintiff submits that Summit View caused Adkins's death, caused Adkins's mental and physical pain and loss of enjoyment during life, forced Adkins to incur medical expenses as a result of hospitalization and injuries caused by Summit View's conduct, and caused plaintiff pecuniary loss, mental anguish, emotional pain and suffering, and other damages [Doc. 25]. Plaintiff does not elaborate as to the specific facts or details underlying these allegations. In an apparent attempt to clarify the causal link between Summit View's alleged acts or omissions and Adkins's death, plaintiff states that:

> because the Defendant accelerated Ms. Adkins' [sic] death, even if it was by hours, minutes or seconds, the Defendant is liable for her death. Hence, the Plaintiff is entitled to recover because Ms. Adkins['s] chances of survival would have been greater if it had not been for the Defendant's negligence, because the burning candle of light is such a precious light in anyone's existence that no one has a right to extinguish it before it flickers out into infinite consciousness.

[Doc. 36].

## II. Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The

9

moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002).

Yet, "[o]nce the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in

10

other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## III.  Analysis

### 1.  Negligence Claims

#### a.  Ordinary Negligence

A prima facie claim for negligence requires a showing that the following elements are present: "'(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause.'" *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) (quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)).  Regarding the limited scope of an ordinary negligence claim against a medical facility like Summit View, the Tennessee Supreme Court has held that:

> The assessment of a patient's condition and the development of a plan of care that determines how often and when a patient needs to be fed, hydrated, bathed, turned, or repositioned may require specialized medical skills, and thus should proceed under the TMMA. A nursing home's failure to ensure that its staff, including certified nursing assistants, actually complies with the plan of care and performs services that, however necessary, are routine and nonmedical in nature, falls into the category of ordinary negligence.

*Estate of French v. Stratford House*, 333 S.W.3d 546, 560 (Tenn. 2011) (footnote omitted).

In this case, plaintiff fails to create a genuine issue of material fact as to whether Summit View's nonmedical employees undertook a duty to provide care to Adkins while

she was present at Summit View. It is undisputed that no plan of care, which is what creates a duty on the part of nonmedical employees to comply with its directives, was implemented as to Adkins because Summit View could not obtain an interpreter and thus would not have been able to communicate with Adkins upon her admission to Summit View. In other words, there was no plan of care such as to create a duty on Summit View's part for purposes of ordinary negligence, and correspondingly, there could be no failure to comply on the part of the staff of Summit View.

Plaintiff asserts, nonetheless, that Summit View breached a duty of care as to Adkins because Summit View was required by law to have an ongoing contractual arrangement with an interpreting agency to ensure available interpreters, because Summit View illegally discriminated against Adkins by refusing to care for her because she was blind and deaf, because Summit View refused to place her in a room, and because Summit View refused to provide her with an interpreter [Doc. 36 ¶¶ 11, 12]. Yet, plaintiff does not address the antecedent question of whether nonmedical employees at Summit View undertook a duty of care to Adkins. Instead, plaintiff emphasizes that Summit View admitted Adkins because it agreed to her transfer from UT Medical Center, though it is unclear how this relates to the question of whether a plan of care was implemented as to Adkins [*Id.* ¶ 15]. Moreover, plaintiff's claims relating to discrimination on the basis of Adkins's condition and Summit View's failure to provide an interpreter are, in substance, ADA claims, which have been dismissed.

In accordance with the Sixth Circuit and Tennessee Supreme Court's statements on ordinary negligence in this context, plaintiff must offer evidence that nonmedical personnel's implementation of Adkins's plan of care caused the injuries to Adkins and plaintiff. Yet, there was no plan of care for nonmedical personnel to implement in this case. In fact, even accepting as true plaintiff's version of the facts in terms of the amount of time Adkins was present at Summit View,[2] plaintiff does not dispute Summit View's assertions that the Rural Metro emergency medical technicians, who accompanied Adkins from UT Medical Center to Summit View and then back to UT Medical Center, were present the entire time Adkins was at Summit View and that Adkins remained on their gurney throughout this time. Because plaintiff has not presented evidence that Summit View created a plan of care for Adkins, there is not a genuine issue of material fact as to whether Summit View's nonmedical personnel undertook a duty to provide treatment to Adkins.

Furthermore, plaintiff has not created a genuine issue of material fact as to the causation-in-fact or proximate causation elements of her ordinary negligence claim. It is undisputed that Adkins died of nasopharyngeal carcinoma, a disease with which she was afflicted when she made the trip to Summit View, nearly ten months after her trip to Summit View. Plaintiff does not offer affirmative evidence indicating a causal link

---

[2] While the Court notes that plaintiff's temporal allegations are admittedly her own suppositions, resolution of this factual dispute is not central to the disposition of this motion, given the other material undisputed facts discussed herein.

between Adkins's time at Summit View and any injury to Adkins or exacerbation of Adkins's prior condition.

In summary, plaintiff has not pointed to any affirmative evidence indicating that Summit View's nonmedical employees undertook a duty of care to Adkins or, even if such a duty existed and was breached, caused any injury to Adkins or plaintiff. Instead, plaintiff has merely alleged a causal connection in a conclusory fashion and has failed to dispute the dispositive contrary evidence presented by Summit View on this issue. Mere allegations will not suffice to defeat a motion for summary judgment. *Curtis Through Curtis*, 778 F. Supp. at 1423 (citing *Celotex*, 477 U.S. at 317). Instead, the nonmovant must point to affirmative evidence in the record. *Anderson*, 477 U.S. at 248. Accordingly, Summit View is entitled to judgment as a matter of law on plaintiff's ordinary negligence claim.

### b. Negligence Per Se

The Tennessee Supreme Court has explained negligence per se as follows:

> The standard of conduct expected of a reasonable person may be prescribed in a statute and, consequently, a violation of the statute may be deemed to be negligence per se. When a statute provides that under certain circumstances particular acts shall or shall not be done, it may be interpreted as fixing a standard of care . . . from which it is negligence to deviate. In order to establish negligence per se, it must be shown that the statute violated was designed to impose a duty or prohibit an act for the benefit of a person or the public. It must also be established that the injured party was within the class of persons that the statute was meant to protect.

14

*Estate of French*, 333 S.W.3d at 560–61 (citations omitted) (quoting *Cook ex rel. Uithoven v. Spinnaker's of Rivergate, Inc.*, 878 S.W.2d 934, 937 (Tenn. 1994)). The violation of regulations can also trigger the application of this doctrine. *Id.* at 561.

In the instant matter, plaintiff bases her negligence per se claim on Summit View's alleged violation of a host of statutes and regulations. Yet, at least two of these bases for plaintiff's claim can be dismissed summarily. As mentioned, negligence per se claims based on the ADA have been explicitly rejected by the Sixth Circuit in this case. *Southwell*, 494 F. App'x at 512 n.3. Second, the Tennessee Court of Appeals has held that "[t]he federal regulations are simply too vague and general to constitute a standard of care by which a jury, or for that matter a court, can effectively judge the acts or omissions of health care providers and nursing home operators." *Conley v. Life Care Centers of Am., Inc.*, 236 S.W.3d 713, 733 (Tenn. Ct. App. 2007). Thus, plaintiff's negligence per se claim based on Summit View's alleged noncompliance with federal regulations must be dismissed.

Next, plaintiff alleges that Summit View violated the TNHRRA, the TAPA, and some state regulations and rules, which she submits should set the standard of care in this matter. Summit View counters that because Adkins was not a resident or patient of Summit View, plaintiff's negligence per se claim must fail because Adkins and plaintiff are not within the class sought to be protected by the cited legislation and regulations.

Tenn. Code Ann. § 68-11-901, which is part of the TNHRRA, provides that "[e]very nursing home resident/patient has . . . minimum rights," which are thereafter

15

enumerated. A Tennessee health regulation elaborates that the term "Resident/Patient . . . [i]ncludes but is not limited to any person who is suffering from an illness or injury and who is in need of nursing care." Tenn. Comp. R. & Regs. 1200-08-06-.01(55). Plaintiff alleges that Summit View violated the TNHRRA by denying Adkins that statute's guarantee to patients and residents that they "be free from willful abuse or neglect, as these terms are defined by [Tenn. Code Ann.] § 71-6-102[,]" which is the TAPA. Tenn. Code Ann. § 68-11-901(21). The TAPA defines "abuse or neglect" as:

> the infliction of physical pain, injury, or mental anguish, or the deprivation of services by a caretaker that are necessary to maintain the health and welfare of an adult or a situation in which an adult is unable to provide or obtain the services that are necessary to maintain that person's health or welfare.

Tenn. Code Ann. § 71-6-102(1)(A). So, the crux of plaintiff's negligence per se claim based on these statutes and regulations is that Summit View abused or neglected Adkins.

Assuming that Adkins was a "Resident/Patient," and thus in the protected class—a prerequisite to establishing the negligence per se claim—plaintiff does not provide evidence that Summit View breached the standard of care established by these statutes and regulations sufficient to create a genuine issue of material fact on that point. Plaintiff essentially alleges that Summit View abused or neglected Adkins by depriving her of services necessary to maintain her health and welfare. Yet, plaintiff presents no specific evidence that there were services necessary to maintain Adkins's health and welfare while she was present at Summit View or that Adkins was deprived of such.

16

Moreover, as with her ordinary negligence claim, plaintiff has not presented sufficient evidence that any acts or omissions by Summit View caused Adkins's death from cancer nearly ten months later. Causation is an essential element in a negligence per se claim. *Rains v. Bend of the River*, 124 S.W.3d 580, 590 (Tenn. Ct. App. 2003). Plaintiff alleges generally that Adkins "required medical attention and hospitalization, thereby incurring medical expenses," because of Summit View's conduct, but does not elaborate beyond this general allegation or specify how any deprivation of services by Summit View caused these alleged injuries [Doc. 25 ¶ 26]. Plaintiff also alleges that Adkins "suffered a loss of enjoyment of life in the period from injury to death and suffered mentally and physically between her injury and death" because of Summit View's conduct, yet plaintiff elaborates no further or provides any specific allegations of causation in this regard. [Doc. 25 ¶ 37].

At bottom, plaintiff's allegations do not constitute evidence sufficient to create a genuine issue of material fact as to whether Summit View breached the standard of care established by the TNHRRA, TAPA, and other state rules and regulations, or caused any injury to Adkins. Put differently, based on the evidence plaintiff has offered, a reasonable jury could not find in her favor on her negligence per se claims. Consequently, Summit View is entitled to judgment as a matter of law, and plaintiff's negligence per se claims will be dismissed.

### 2. Other Claims

#### a. Stand-alone TAPA and TNHRRA Claims

Summarily, because the Court finds that plaintiff has failed to create a genuine issue of material fact as to whether Summit View breached any standard of care as established by the TNHRRA, TAPA, and other state rules and regulations as to plaintiff or Adkins, the Court will dismiss any stand-alone claims under such provisions for the aforementioned reasons.

#### b. Negligent Infliction of Emotional Distress

Plaintiff argues that she has stated a cause of action for negligent infliction of emotional distress because she was on the telephone with Summit View while Adkins was there and suffered emotional distress as a result of her sensory observations through the telephone [Doc. 36]. In Tennessee, to establish a claim for negligent infliction of emotional distress, "[a] plaintiff . . . must (1) satisfy the five elements of ordinary negligence: duty, breach of duty, injury or loss, causation in fact, and proximate or legal cause; (2) establish a 'serious' or 'severe' emotional injury; and (3) support his or her serious or severe injury with expert medical or scientific proof." *Marla H. v. Knox Cnty.*, 361 S.W.3d 518, 529 (Tenn. Ct. App. 2011) (citations and quotation marks omitted).

First, as previously addressed, plaintiff has failed to establish a genuine issue of material fact on the issue of negligence, which is a prerequisite to stating a claim for negligent infliction of emotional distress. For this reason, plaintiff's claim must fail. In addition, despite conclusory allegations of mental anguish and emotional distress over

Summit View's alleged acts and omissions as to Adkins, plaintiff has provided no evidence of serious or severe emotional injury that would create a triable issue of fact on that point. Furthermore, plaintiff has not supported her injury allegations with the requisite expert proof. *See Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521, 530 (Tenn. 2008) (stating that "to recover for emotional injuries sustained as the result of the death or injury of a third party a plaintiff must present expert medical or scientific proof of a severe emotional injury"). Accordingly, plaintiff has failed to create a genuine issue of material fact as to whether Summit View negligently inflicted emotional distress upon her. Therefore, Summit View is entitled to judgment as a matter of law, and plaintiff's claim for negligent infliction of emotional distress will be dismissed.

### c. Abandonment

Plaintiff also alleges that Summit View abandoned Adkins. In support, plaintiff claims that "Ms. Adkins was left unattended for a minimum of two hours which impaired her health and welfare" [Doc. 36]. Because Summit View did not admit Adkins, she had to return to UT Medical Center, and plaintiff submits that UT Medical Center did not have a room available for Adkins on the night of December 11, 2009, until almost midnight. As a result, plaintiff contends, Adkins died from her injuries on October 6, 2010. Plaintiff attempts to hold Summit View liable based on the theory that Summit View aggravated Adkins's injuries, which ultimately caused her death. Yet, plaintiff offers no evidence that any acts or omissions by Summit View contributed to Adkins's death from nasopharyngeal carcinoma nearly ten months later.

19

Regardless, in Tennessee:

> For patient abandonment to occur, the nurse must:
>
> a) Have first ***accepted*** the patient assignment, thus establishing a nurse-patient relationship, and then
>
> b) ***Severed*** that nurse-patient relationship without giving reasonable notice to the appropriate person (e.g., supervisor, patient) so that arrangements can be made for continuation of nursing care by others.
>
> A nurse-patient relationship begins when responsibility for nursing care of a patient is accepted by the nurse.

*Miller v. Tennessee Bd. of Nursing*, 256 S.W.3d 225, 230 (Tenn. Ct. App. 2007). Plaintiff's claim does not fit within this rubric. It is undisputed that Summit View did not accept Adkins as a patient and did not provide care for her. Moreover, even if Summit View had accepted the patient assignment, there is no basis upon which to reasonably conclude that Summit View severed the relationship without giving reasonable notice. In fact, it is undisputed that Summit View's physician personally called UT Medical Center to notify that facility that Adkins would be returning because Summit View could not adequately accommodate Adkins, given its lack of an interpreter.

In short, plaintiff has failed to create a genuine issue of material fact as to whether Summit View is liable for patient abandonment under Tennessee law. Thus, plaintiff's claim will be dismissed.

### d. Wrongful Death

Plaintiff alleges that Summit View's negligence proximately caused Adkins injury and ultimately death and thus brings a claim for wrongful death. Under Tennessee law,

20

> The right of action that a person *who dies from injuries received from another, or whose death is caused by the wrongful act, omission, or killing by another*, would have had against the wrongdoer, in case death had not ensued, shall not abate or be extinguished by the person's death but shall pass to the person's surviving spouse and, in case there is no surviving spouse, to the person's children or next of kin.

Tenn. Code Ann. § 20-5-106(a) (emphasis added). Thus, the wrongful death statute "only applies where death resulted from acts of the defendant out of which the suit is brought." *Carne v. Maryland Cas. Co.*, 346 S.W.2d 259, 262 (Tenn. 1961).

In the instant matter, though plaintiff alleges that Summit View's acts or omissions aggravated Adkins's condition and thereby caused her death nearly ten months later, beyond bare, conclusory allegations, plaintiff offers no evidence to indicate any connection between Adkins's time at Summit View and any worsening of her nasopharyngeal carcinoma or any other condition from which Adkins suffered.

Accordingly, there is not a genuine issue of material fact as to whether Adkins's death resulted from acts or omissions by Summit View. Therefore, Summit View is entitled to judgment as a matter of law on this claim, which will be dismissed.

## IV.    Conclusion

For the reasons stated herein, Summit View's motion for summary judgment [Doc. 30] will be **GRANTED**, and plaintiff's claims will be **DISMISSED**.

ORDER ACCORDINGLY.


s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE